JOSE GONZALEZ,

                Plaintiff,

v.                                          Case No. 24-cv-739-pp

SARA ENGLISH,

                Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 30) AND DISMISSING CASE**

      Plaintiff Jose Gonzalez, who is incarcerated and is representing himself, filed this case alleging violations his constitutional rights. The court allowed the plaintiff to proceed on Eighth Amendment and state law medical malpractice claims based on allegations that the defendant did not provide him adequate medical care after his self-harm incident. Dkt. No. 13 at 5. The defendant has filed a motion for summary judgment. Dkt. No. 30. The court will grant the defendant's motion and dismiss the case.

**I.    Facts[1]**

      The court allowed the plaintiff to proceed on an Eighth Amendment claim and a medical malpractice claim under Wisconsin state law against Dr. Sara English, based on the plaintiff's allegation that the defendant failed to properly treat his medical condition after he self-harmed on March 6, 2024, and for two weeks thereafter, until he was taken to the hospital. Dkt. No. 31 at ¶3.

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

Specifically, the plaintiff alleges that on March 6, 2024, the defendant failed to accurately gauge how much blood he had lost in his cell, and she did not treat him for shock even though he continually lost consciousness and vomited on himself in front of her. Id. at ¶4. The plaintiff also alleges that he suffered with anemia/anemic side effects for two weeks until he was admitted to the hospital, and that the defendant did not immediately order a blood test to determine whether he was in hemorrhagic shock and in need of a transfusion. Id. at ¶5.

On March 3, 2024, the plaintiff was transferred to Waupun from Columbia Correctional Institution. Id. at ¶1. The day before his transfer, the plaintiff received a conduct report for assault on an employee, threats, taking a hostage and possession, manufacture or use of weapons. Id. at ¶2. The defendant is employed by the Wisconsin Department of Corrections as a physician at Dodge Correctional Institution. Id. at ¶6. In March 2024, the defendant worked at Waupun two days a week because the institution did not have an assigned medical provider. Id. at ¶7.

On March 6, 2024, Nurses Matthew Barth and Kat Krainyk reported to the restrictive housing unit (RHU) to see the plaintiff for a self-inflicted laceration to his foot. Id. at ¶8. Krainyk initially was called to the unit to assist the plaintiff, but due to the plaintiff's recent behavior harming physically vulnerable staff, she asked Barth to assist. Id. at ¶9. When Barth arrived on the unit, security staff removed the plaintiff from his cell and took him to the RHU treatment room. Id. at ¶10. Krainyk examined the plaintiff's cell and observed coagulated blood on the floor with the words "Van Buren let's talk"

written on the wall in blood. Id. at ¶11. Krainyk documented that there was about 200-400 milliliter (mL) of blood loss.[2] Id.

Recognizing the degree of blood loss via vital signs and mental status abnormalities is important for recognizing potential hemorrhagic shock. Id. at ¶12. There are four classes of blood volume loss and expected signs and symptoms within each class:

> a. Class one is volume loss up to 15% of total blood volume, which is approximately 750 mL for the average male based on weight. With class one volume loss, patients typically experience minimally elevated or normal heartrate, no change in blood pressure, pulse pressure, or respiratory rate.
>
> b. Class two is volume loss from 15-30% of total blood volume, which is approximately 750-1500 mL. Patients typically experience an elevated heartrate, pulse pressure begins to narrow, and blood pressure may be unchanged to slightly decreased.
>
> c. Class three is volume loss from 30-40% of total blood volume, which is approximately 1500-2000 mL. Patients typically experience a significant drop in blood pressure, changes in mental status, significantly elevated heartrate and respiratory rate, urine output declines and capillary refill is delayed.
>
> d. Class four is volume loss over 40% of total blood volume. Patients typically experience hypotension with narrow pulse pressure, tachycardia (>120 beats per minute [BPM]), mental status becomes increasingly altered, urine output is minimal or absent, and capillary refill is delayed.

Id. at ¶13.

Hemorrhagic shock is a life-threatening condition caused by severe blood loss, resulting in the body's inability to deliver enough oxygen to the vital organs. Id. at ¶14. Symptoms of shock include rapid heart rate, weak or rapid

---

[2] The plaintiff states that Krainyk could not have properly approximated the amount of blood he lost in cell B-201 because when officers entered the cell to get him out, they laid blankets on the floor that covered the blood. Dkt. No. 42 at ¶11.

3

pulse, pale or blue skin, shallow breathing, low blood pressure, excessive sweating, little or no urine output, and confusion, dizziness or loss of consciousness. Id. Management of class one blood loss involves monitoring for changes in vital signs and mental status. Id. at ¶15. Individuals with abnormal vital signs, changes in mental status, or any other concerns for more severe blood loss would be transferred to the hospital. Id.

On March 6, 2024, Barth took the plaintiff's blood pressure, which was 112/80, and his pulse, which was 84 beats BPM, both within normal limits. Id. at ¶16. There was no active bleeding until Barth started to clean the plaintiff's wound, at which point there was small venous bleeding, which occurs when a vein is torn or cut. Id. at ¶17. Barth applied pressure to the wound and the plaintiff started staring and grunting at him. Id. Barth asked security staff to apply a spit mask due to the plaintiff's prior conduct, but security declined, so Barth returned to the treatment room and continued applying pressure to the wound. Id. at ¶18. When Barth returned, the plaintiff stated, "Fucking bitch ass, let me find you in GP [general population] when I'm out there, I'm gonna merk yo ass! You know how long I'm in here? You think I give a fuck if I kill another mother fucker? You country boys go down so easily!" Id. at ¶19. Barth told the plaintiff that that type of language was unacceptable, and that he would receive a conduct report for making threats. Id. at ¶20. Barth asked Krainyk to retrieve surgical glue for the wound and the plaintiff continued to comment about murdering Barth. Id. at ¶21. The plaintiff spoke aggressively to Barth, telling him that he was incompetent as a nurse, that he had hit a major artery in the plaintiff's foot, that the plaintiff was bleeding out and that he needed to be sent out. Id. at ¶22. After about five minutes the plaintiff stated, "I'm refusing care! Get the fuck away from me!" Id. at ¶23. Barth observed a

4

small ooze of blood still coming from the plaintiff's foot at that time. Id. He stopped medical care and completed an incident report based on the plaintiff's behavior. Id.

Around 4:15 p.m., defendant English (along with Krainyk) reported to RHU to see the plaintiff and to evaluate the laceration for possible sutures. Id. at ¶24. When the defendant arrived at the plaintiff's cell, she observed officers placing him into a restraint chair to take him to the RHU treatment room for the examination. Id. at ¶25. The defendant looked in the plaintiff's cell and saw a thin layer of blood that she estimated to be 200-400 mL.[3] Id. at ¶26. The defendant met the plaintiff in the RHU treatment room. Id. at ¶27. The defendant first observed the plaintiff moving his head around freely, showing full cervical strength and range of motion.[4] Id. at ¶28. She noted that the plaintiff looked somewhat pale, but because this was her first time seeing him, she couldn't be sure if he was pale or if that was his normal skin tone. Id. The plaintiff stated that he believed he was going into shock.[5] Id. at ¶29. The defendant introduced herself to the plaintiff and advised him that his heartrate was in the 70's and that his oxygen saturation was in the upper 90's, so

---

[3] The plaintiff disagrees that this is the amount of blood the defendant saw in his RHU holding cell, because Krainyk estimated that she saw about 600 mL of blood loss in that cell. Dkt. No. 42 at ¶26.

[4] The plaintiff disagrees and says that when the defendant entered the RHU HSU treatment room, he was unconscious and unresponsive and that any head movements were involuntary. Dkt. No. 42 at ¶27. The plaintiff cites to Lt. Fisher's body cam footage, which he did not provide to the court.

[5] The plaintiff disagrees and says that he was unconscious and nonresponsive when the defendant first entered room. Dkt. No. 42 at ¶28. He again cites to Lt. Fisher's body cam footage, which he did not provide to the court.

5

hemorrhagic shock was not occurring.[6] Id. at ¶30. The defendant explained to the plaintiff that his heartrate and oxygen saturation were normal and showed no indication of shock. Id. at ¶31. Pale skin alone does not indicate hemorrhagic shock. Id. at ¶32. The plaintiff then told the defendant, "If this is how it's going to be, y'all can just take me back to my cell." Id. at ¶33. The defendant advised the plaintiff that he had the right to refuse treatment, and he responded, "I am not refusing. I am just wondering if you're going to act right." Id.

At that point, the plaintiff yelled, "You don't believe me? I'm pouring sweat, I'm nauseated, in fact . . . ." Id. at ¶34. The defendant then saw the plaintiff begin to bear down and rhythmically move his abdominal muscles. Id. She watched him purposely cause a vagal response (a self-induced vomiting technique) on the pulse oximeter (which measures heartrate and oxygen saturation). Id. The defendant saw his heartrate go down to 50, at which point he vomited, and then his heartrate went back up between 70-80 BPM. Id. The plaintiff then threw the pulse oximeter in response to the heartrate and pulse oximeter being read out loud in an attempt to assure him his level was normal. Id. The defendant felt like the plaintiff did that to take that knowledge away from the defendant to obscure the situation more.[7] Id.

---

[6] The plaintiff disagrees and says that the defendant told him that he was faking and that he should stop acting or she wouldn't try to help him (although he also says that he was unconscious and unresponsive). Dkt. No. 42 at ¶30. The plaintiff cites to Lt. Fisher's and Officer Jokotugun's body camera footage, which he did not provide the court.

[7] The plaintiff disagrees and says that he did not yell anything because he did not have the strength to yell and that during the time he vomited he was unconscious. Dkt. No. 42 at ¶34. He again cites to Lt. Fisher's body camera footage, which he did not provide the court.

6

Krainyk and the defendant attended to the small, shallow laceration on the plaintiff's foot that measured less than one centimeter in length and less than one millimeter across.[8] Id. at ¶35. At this time, there was no active bleeding. Id. at ¶36. The defendant observed marks around the wound that looked like pressure was applied to encourage bleeding. Id. The plaintiff then started yelling, "I'm going to kill you," and he told security staff, "I'm going to kill that broad." Id. at ¶37. The nurse closed the wound using Dermabond, which is a sterile, liquid skin adhesive that holds wounds together.[9] Id. at ¶38. The adhesive usually stays in place for five to ten days, then naturally falls off the skin. Dermabond is effective for closing superficial wounds. Id. As security was wheeling the plaintiff out of the room, he stated one more time, "I'm serious. I'm going to kill you." Id. at ¶39. The defendant found no reason to believe that the plaintiff was losing consciousness during the appointment because he responded to verbal commands "sensically," indicating he had no confusion. Id. at ¶40. The plaintiff reported nausea and diaphoresis, but not dizziness. Id. His heartrate remained below 100 the entire time the pulse oximeter was in place.[10] Id.

---

[8] The plaintiff disagrees and says that the defendant did not examine or treat him during the examination. Dkt. No. 42 at ¶37. He again cites to Lt. Fisher's body camera footage, which he did not provide the court.

[9] The plaintiff disagrees and says that Krainyk only put a Band-Aid over a bloody wound. Dkt. No. 42 at ¶38. He again cites to Lt. Fisher's body camera footage, which he did not provide the court.

[10] The plaintiff disagrees and states that he was unconscious when he was first brought into the exam room, that he vomited, that the defendant did not look at the pulse oximeter during the exam and that she never took his blood pressure. Dkt. No. 42 at ¶40. He again cites to Lieutenant Fisher's body camera footage, which he did not provide the court.

7

The defendant ordered a follow-up blood draw to continue monitoring the plaintiff's anemia. Id. at ¶41. The plaintiff had been chronically, significantly anemic since October 2023 due to self-inflicted blood loss. Id. At about 9:24 p.m., the plaintiff refused a check of all his vitals. Id. at ¶42. It is the defendant's normal practice to ask nursing staff to check on the plaintiff after a few hours to make sure his vital signs and mental status don't change significantly over time. Id. At 10:15 p.m., the plaintiff refused a nurse reassessment. Id. at ¶43.

The plaintiff had started a hunger strike on March 3, 2024 when he arrived at Waupun and was monitored daily by medical and security staff. Id. at ¶44. Medical staff offered to check his vitals as part of monitoring. Id. During his hunger strike, he refused meals and sometimes water. Id. If he had exhibited new or worsening symptoms after his blood loss, he could have asked to be seen and reassessed. Id. Although a short-term hunger strike may not dramatically affect a patient's blood count, a poor diet with insufficient nutrients—particularly iron, B vitamins and vitamin C—can affect the patient's blood count because the body doesn't have the nutrients it needs to produce red blood cells. Id. The plaintiff continued to refuse vital checks, meals and/or water on March 7, 2024. Id. at ¶45.

On March 21, 2024, the defendant was notified that the plaintiff's blood labs (taken the day before) showed a hemoglobin level of 6.5, which is considered low and anemic, and which warranted a blood transfusion. Id. at ¶46. The defendant ordered the plaintiff's transfer to the hospital, where he was admitted overnight for a blood transfusion; he was returned the following day. Id. at ¶47. Signs and symptoms of anemia include fatigue and weakness, shortness of breath, dizziness or lightheadedness, pale skin, cold hands and

feet and headaches. Id. at ¶48. Treatment of anemia depends on the cause and the lab results. Id. The plaintiff routinely was offered vital checks; if his vital signs were off, nursing staff would have let the defendant know and she would have followed up. Id.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

9

B. Discussion

The defendant contends that the plaintiff's Eighth Amendment claim fails because he did not have a serious medical need, the defendant did not act with deliberate indifference and the plaintiff did not suffer a cognizable injury. Dkt. No. 34 at 9-12. The defendant also contends that she is entitled to qualified immunity. Id. at 12-14. Finally, she contends that the court should relinquish supplemental jurisdiction over the plaintiff's state law claim. Id. at 14.

The plaintiff responds that the defendant acted with deliberate indifference because she did not adequately estimate his blood loss or provide him with adequate care. Dkt. No. 41 at 5. According to the plaintiff, his "overall demeanor showed multiple symptoms of hemographic[11] shock" and "[the defendant] did nothing which resulted in [the plaintiff] being left in a critical state of blood loss for 2 weeks which shows deliberate indifference and negligent medical malpractice." Id. According to the plaintiff, the defendant "says [the plaintiff] was not in hemographic shock yet [he] was unconscious, unresponsive, shaking, sweating, vomiting, breathing heavy, moving involuntary [sic], and disoriented and pale, these are all signs of anemia." Id. at 7. According to the plaintiff, the defendant "left [the plaintiff] in a critical life threatening state for 2 weeks because she chose not to do her job." Id. at 8.

The court analyzes the plaintiff's claim that the defendant was deliberately indifferent to his serious medical needs under the Eighth Amendment's cruel and unusual punishments clause. Estelle v. Gamble, 429 U.S. 97, 104 (1976). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must show that he "is

---

[11] The court suspects the plaintiff means "*hemorrhagic* shock."

10

incarcerated under conditions posing a substantial risk of serious harm." Id. In the context of a claim that prison staff were deliberately indifferent to a plaintiff's serious medical need, the objective component requires the plaintiff to show that his medical need constituted a risk of an objectively serious harm. Stewart v. Wexford Health Sources, Inc., 14 F.4th 757, 763 (7th Cir. 2021) (citing Balsewicz v. Pawlyk, 963 F.3d 650, 654 (7th Cir. 2020)).

To satisfy the subjective component, the plaintiff must demonstrate that the defendant had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015) (citing Farmer, 511 U.S. at 837). "The standard of deliberate indifference 'requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk.'" Stewart, 14 F.4th at 763 (quoting Huber v. Anderson, 909 F.3d 201, 208 (7th Cir. 2018)). The evidence must show the defendant's "actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844-45).

In the context a claim of deliberate indifference against a medical provider, the subjective component requires the plaintiff to show that the medical professional's treatment decision was "so inadequate that it demonstrated an absence of professional judgment." Stewart, 14 F.4th at 763 (quoting Johnson v. Dominguez, 5 F.4th 818, 826 (7th Cir. 2021)). Put another way,

> "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have

11

> so responded under those circumstances.'" [*Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)] (quoting *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008)). "To infer deliberate indifference on the basis of a [medical professional's] treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

Id.

The defendant contends that the plaintiff did not have a serious medical need because his self-inflicted injury—a one centimeter by one millimeter cut that had stopped bleeding by the time the defendant arrived—was a minor injury that did not rise to the level of a serious medical need. Dkt. No. 34 at 9. She also states that the plaintiff's oxygen level, blood pressure and pulse were normal and did not support the plaintiff's assertion that he had suffered hemorrhagic shock. Id. at 10.

Although the plaintiff's cut was small, it bled a lot and the plaintiff needed medical care to stop the bleeding and treat the wound. The plaintiff also had anemia and was on a hunger strike. The court assumes for the purpose of summary judgment that the plaintiff's condition amounted to a serious medical need. See Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997) (serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention[]") (quotation omitted)). The court will focus on whether the defendant acted with deliberate indifference.

The defendant first received medical care from Nurse Barth, who took his blood pressure and pulse; both were within normal limits. The wound started bleeding again when Barth began to clean it, so he applied pressure. The plaintiff stared and grunted at Barth, eventually threatened to kill Barth and refused further treatment from him. A small ooze of blood was still coming from

12

the plaintiff's foot. Later that afternoon, the defendant arrived to evaluate the plaintiff's wound. The plaintiff avers that he does not remember much of the defendant's treatment of him because he was unconscious.[12] See Dkt. No. 43 at ¶¶12-14.

The undisputed facts show that the defendant treated the plaintiff's cut, which stopped the bleeding. She also took his vital signs, which did not indicate that he was experiencing a hemorrhagic shock. Based on the defendant's examination and the vitals readings, she determined that at most, the plaintiff had suffered a class one blood volume loss. She ordered that his blood be checked. The plaintiff admits that he refused assessments and treatments after the March 6, 2024 incident. When the plaintiff's hemoglobin level fell a couple weeks after the incident, the defendant ordered that he receive a blood transfusion.

The plaintiff disagrees with the defendant's assessment of the amount of blood loss in the RHU holding cell and he points out that Nurse Krainyk estimated the blood loss in that cell to be 600 ml, not the 200-400 ml that the defendant estimated. Dkt. No. 41 at 6-7. The plaintiff also says that if you add the blood he lost in the RHU holding cell to the 200-400 ml of blood lost in his first cell, he lost enough blood to qualify as a class 2 blood loss. Id. at 7. But even assuming that the defendant mis-estimated the amount of blood loss in the RHU holding cell, that does not demonstrate that her treatment of the plaintiff amounted to deliberate indifference. As described above, a diagnosis of

---

[12] As indicated above, the plaintiff says that he disputes some of the defendant's proposed findings of fact regarding her treatment of him on March 6, 2024, citing to body camera footage. See supra. at 6-9. But the plaintiff did not submit body camera footage as part of his summary judgment response materials. Because the plaintiff did not file this footage, the defendant's version of her treatment of the plaintiff essentially is undisputed.

13

hemorrhagic shock does not turn solely on the estimation of blood loss but is also revealed through the measurement of vital signs, and the plaintiff had normal heartrate and oxygen levels.

"[A] medical professional's erroneous treatment decision can lead to deliberate indifference liability if the decision was made in the absence of professional judgment." Johnson v. Doughty, 433 F.3d 1001, 1012-13 (7th Cir. 2006) (citing Collignon v. Milwaukee County, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances."); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996) ("[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."). But the plaintiff has not demonstrated that the defendant failed to exercise professional judgment while treating him. The plaintiff's disagreement with the defendant's treatment decisions does not prove that she was deliberately indifferent. See Pyles v. Fahim, 771 F.3d 403, 413 (7th Cir. 2014) (plaintiff's disagreement with doctor's treatment decisions for back pain did not amount to deliberate indifference); see also Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006). A reasonable factfinder could not conclude that the defendant violated the plaintiff's constitutional rights.

The court will grant the defendant's motion for summary judgment. Because the court has concluded that the plaintiff has no federal claim, the

14

Case 2:24-cv-00739-PP    Filed 01/26/26    Page 14 of 16    Document 45

court will relinquish supplemental jurisdiction over the plaintiff's state law claim. See 28 U.S.C. §1367(c)(3); Lavite v. Dunstan, 932 F.3d 1020, 1034-35 (7th Cir. 2019).

### III. Conclusion

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 30.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court.* See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under

Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 26th day of January, 2026.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**